Sucesión Rodríguez, Demandante y Apelada, *v.* Sucesión Torres, Demandada y Apelante.

Apelación procedente de la Corte de Distrito de Ponce en pleito sobre nulidad de procedimiento ejecutivo hipotecario.

No. 1392.—Resuelto en febrero 12, 1917.

Ordenes Generales—Instrucciones del Presidente de los Estados Unidos—Derechos Adquiridos por un Acreedor Hipotecario—Suspensión de la Acción de la Ley Hipotecaria.—Aplicando a este caso la doctrina establecida en el de *Ochoa* v. *Hernández,* 230 U. S. 139, del lenguaje empleado en las instrucciones del Presidente de los Estados Unidos al Secretario de la Guerra (Orden No. 101 de 13 de julio de 1898), no puede decirse que autorice el grave menoscabo de los derechos adquiridos por un acreedor hipotecario mediante el efecto retroactivo de una orden militar que pretende suspender la acción de la Ley Hipotecaria.

Id.—Ejecución de Hipoteca Dentro de las Disposiciones de la Antigua Ley de Enjuiciamiento Civil.—La Orden General No. 18 de febrero 12, 1898, no tuvo por objeto permitir la ejecución de hipotecas sobre las cuales se habían pagado los intereses o que no devengaban intereses, bajo la antigua Ley de Enjuiciamiento Civil, pues eso sería intercalar en ella un precepto que jamás tuvo en mente el gobierno militar.

Id.—Ejecución de Hipoteca—Ordenes Generales Nulas—Privación de Propiedad sin el Debido Procedimiento de Ley.—La Orden General No. 18 de febrero 12, 1898, del General Henry, fué promulgada en exceso de la facultad legislativa conferida al gobierno militar de acuerdo con las instrucciones del Presidente, y, por tanto, es nula y sin ningún valor en lo que respecta a las hipotecas existentes antes de su adopción, porque de admitirse su vigencia hubiera menoscabado la obligación de dichos contratos privando al acreedor hipotecario de sus derechos adquiridos por virtud de los mismos.

Hipoteca—Ley Vigente al Constituirse.—Es regla general que la ley vigente al constituirse una hipoteca con las limitaciones y condiciones impuestas por la misma, es la que determina su fuerza y efectos. De ahí que los cambios en las leyes que imponen condiciones y restricciones al acreedor hipotecario al hacer valer sus derechos y que afectan a su esencia, son nulos y no pueden prevalecer por menoscabar la obligación.

Los hechos están expresados en la opinión.

Abogado de la apelante: *Sr. José Tous Soto.*

Abogado de la apelada: *Sr. José G. Torres.*

El Juez Asociado Sr. Hutchison, emitió la opinión del tribunal.

Los demandantes y apelados establecieron una acción para reivindicar ciertas fincas que fueron vendidas en junio de 1901, de acuerdo con el procedimiento sumario prescrito por

la Ley Hipotecaria. En la demanda se alegó la nulidad de la venta y se funda principalmente en la proposición de:

"Que al iniciarse el procedimiento en cobro de los referidos créditos hipotecarios y durante todo el curso del mismo, se encontraba en suspenso el procedimiento para el cobro de créditos hipotecarios por orden general del Comandante en Jefe del Departamento de Puerto Rico, No. 18, de 12 de febrero de 1899; No. 10, de 19 de enero de 1900 y 92 de 28 de abril de 1900, careciendo la Corte de. Distrito de Ponce de jurisdicción para conocer del referido procedimiento hipotecario y para subastar la finca hipotecada."

Los demandados y apelantes niegan que esto sea así, e insisten en el hecho de que las referidas órdenes son "anticonstitucionales" por no tener el Gobernador Militar facultad para privar de este modo a los acreedores hipotecarios de sus derechos adquiridos por virtud de la Ley Hipotecaria.

El juez sentenciador dictó sentencia a favor de los demandantes pero la "relación breve del caso exponiendo los hechos según éstos resulten ante él y dando las razones en que funde su decisión," como lo exige la ley titulada "Ley para enmendar los artículos 92, 123 y 299 del Código de Enjuiciamiento Civil," aprobada en 9 de marzo de 1911, brilla por su ausencia.

En el caso de *Oliver* v. *Oliver,* 23 D. P. R. 181, dijimos que teníamos gran duda respecto a si la doctrina establecida en el caso de *Ochoa* v. *Hernández,* que aparece en el tomo 230 U. S., página 139, debía regular la cuestión que ahora se suscita debidamente por primera vez en este tribunal. Quizás si la corte de distrito estuvo influída indebidamente por tal *obiter dictum,* pero ni el juez sentenciador ni las partes en esta acción, han podido desarrollar en alguna forma notable el pensamiento sugerido entonces; y a la verdad que después de considerar con más detenimiento la cuestión, no encontramos una razón satisfactoria en la que basar una clara distinción respecto al principio fundamental envuelto.

En el caso de *Ochoa* v. *Hernández,* la Corte Suprema sin resolver si la autoridad del comandante militar en Puerto Rico

quedaba o no sujeta a las mismas limitaciones constituciona-
les como lo está la del Congreso, sostuvo el criterio de que de
acuerdo con las instrucciones comunicadas por el Presidente
McKinley al Secretario de la Guerra en 13 de julio de 1898
con referencia a Cuba, Ordenes Generales del Departamento
de la Guerra, No. 101, hechas obligatorias para el Gobernador
de Puerto Rico por virtud de la comunicación remitiendo ins-
trucciones de fecha julio 29, publicada por orden del General
Miles para información y guía de todos los interesados y que
de tal modo continuaron en vigor como reconocida declaración
de principios por los cuales estaba limitado el gobierno mili-
tar, el gobernador militar carecía de autorización del Presi-
dente para dictar ninguna orden, judicial por su naturaleza,
que tuviera el efecto de privar a ninguna persona de su pro-
piedad sin el debido procedimiento de ley.

En estas instrucciones del comandante en jefe se dice que
los habitantes del territorio ocupado tenían ''derecho a ser
protegidos en sus personas y bienes y en *todos sus derechos y
relaciones privadas*,'' y se hace constar en ellas ''el propósito
de los Estados Unidos de cumplir *en todo lo posible* sus obli-
gaciones en este sentido.''   Proclaman dichas instrucciones
que ''las leyes municipales del territorio conquistado, tales
como las que afectan a los *derechos privados de las personas
y a su propiedad* y las que prescriben un castigo para el delito,
se consideran que continúan en vigor en tanto son compatibles
con el nuevo estado de cosas hasta tanto sean suprimidas
o modificadas por el ejército ocupante, y en la práctica *gene-
ralmente no son derogadas sino permitidas continuar en vigor*
y ser administradas por los tribunales ordinarios sustancial-
mente en la misma forma en que se encontraban antes de la
ocupación,'' y se dispone en las referidas instrucciones que
''*esta práctica sabia ha de ser observada* en tanto sea posible
en la presente ocasión.''

El carácter previsor de estas limitaciones que como tam-
bién ha indicado la Corte Suprema ''eran aquellas que surgen
de reglas generales de derecho internacional y de principios

fundamentales que son conocidos donde quiera que ondea la bandera americana,'' se revela inmediatamente.

Si en el lenguaje empleado se prohibe privar a una persona de la propiedad sin el debido procedimiento de ley mediante el efecto retroactivo de una orden militar que reduce el término de prescripción dentro del cual un título posesorio puede quedar convertido en una declaración judicial de dominio, privando de este modo inmediatamente del derecho de acción de cualquiera o todas las personas que estén ya fuera de posesión por más tiempo del fijado en el período más corto y que no han alegado previamente sus derechos superiores, difícilmente puede decirse que autoriza el grave menoscabo de los derechos adquiridos por un acreedor hipotecario mediante el efecto retroactivo de una orden militar que pretende suspender la acción de la Ley Hipotecaria.

El concepto de lo que son derechos adquiridos no es cosa nueva para la Ley Civil. ''Las previsoras máximas de los jurisconsultos romanos en desaprobación de todas las leyes retroactivas fueron observadas por Bracton en el siglo trece, han sido repetidas por Coke y Bacon y aplicadas por las cortes de Inglaterra en la única forma que es posible en un parlamento omnipotente; o sea, como una regla de interpretación al efecto de que nunca se considerará que un estatuto priva o despoja de derechos adquiridos, si es susceptible de cualquier otra significación. Los mismos principios doctrinales de los jurisconsultos romanos, ingleses y continentales han venido a formar parte del derecho constitucional americano.'' McGehee, sobre Debido Procedimiento de Ley, p. 153.

Las Ordenes Generales envueltas en este pleito son las siguientes:

''CUARTEL GENERAL,
''DEPARTAMENTO DE PUERTO RICO,
''*San Juan, febrero 12, 1899.*

''ORDENES GENERALES,
    ''No. 18.

''Habiéndose representado al Comandante del Departamento por medio de escritos y solicitudes y por otros medios, a su satisfacción,

que debido a la grave crisis ocasionada en el país por la pasada gue-
rra y por el retraimiento de los capitales que se invertían en los nego-
cios de esta Isla los agricultores no pueden pagar sus deudas aun
cuando poseen fincas de mucho valor; teniendo en cuenta, además,
que muchos hombres de negocios al proceder a la liquidación de éstos
gestionan judicialmente la venta de fincas agrícolas hipotecadas en
garantía de créditos vencidos, que no pueden pagar aquéllos, con
lo cual se les crea un grave conflicto en sus intereses; que bajo el
régimen de las actuales leyes los procedimientos de cobro de esos
créditos en la vía judicial son de carácter muy sumario, al extremo
de que la venta se ha de hacer en los treinta días siguientes, a con-
tar desde el requerimiento judicial de pago, y que por consiguiente
carece el deudor del tiempo necesario en las presentes circunstan-
cias. para levantar fondos que no puede hallar fácilmente.

"Por la presente se ordena que por razón de beneficio y equidad
en favor de los agricultores de la Isla, y para salvar a la agricul-
tura y a las industrias agrícolas de las pérdidas y quebrantos que
ese estado de cosas le ocasiona, quede en suspenso la vigente Ley
Hipotecaria en cuanto al procedimiento para hacer efectivo créditos
contra fincas agrícolas de todo género y las industrias y máqui-
narias a ellas afectas.    Esta suspensión durará el término de un
año, a contar desde esta fecha, o sea desde enero 19 de 1899, hasta
igual fecha de 1900; y es claridad que esta concesión y beneficio
no será aplicada en favor de los deudores que no paguen desde luego
y en lo sucesivo el interés convenido por sus deudas, siempre que
no exceda del tipo máximo del 12 por ciento anual.

"Esta orden no será aplicada a los procedimientos que se  sigan
para el cobro de contribuciones insulares y municipales.

"Y para que esta orden se ponga inmediatamente en vigor, se
ordena su publicación en la 'Gaceta Oficial,' y se comunica en seguida
a todos los alcaldes, jueces y tribunales de la Isla para su conoci-
miento y ejecución.

"Por mandato del MAYOR GENERAL HENRY;

"W. P. HALL,
"*Ayudante-General.*"

———————

"CUARTEL GENERAL,
"DEPARTAMENTO DE PUERTO RICO,
"*San Juan, enero 19, 1900.*

"ORDENES GENERALES,
"No. 10.

"Por orden del Secretario de la Guerra, las disposiciones de

'Ordenes Generales' No. 18, serie de 1899, de este Cuartel General, mandando suspender la ejecución de hipotecas en la Isla de Puerto Rico hasta enero 19, 1900, quedan prorrogadas por seis meses más, a partir de esta última fecha, o por el plazo más reducido que en adelante anunciare la autoridad competente.

"Por mandato del BRIGADIER GENERAL DAVIS,

"W. P. HALL,
"*Ayudante General.*"

"CUARTEL GENERAL,
"DEPARTAMENTO DE PUERTO RICO,
"*San Juan, abril 28, 1900.*

"ORDENES GENERALES,
    "No. 92.

"En cumplimiento de instrucciones recibidas del Secretario de la Guerra, las disposiciones de las Ordenes Generales No. 18, serie de 1899, de este Cuartel General, fechadas febrero 12, 1899, y las Ordenes Generales No. 10, serie corriente, de este Cuartel General, fechadas enero 19, 1900, se prorrogan nuevamente por seis meses a partir de julio 19, 1900, sin perjuicio de cualquiera reducción del plazo u otra resolución que  sobre el particular acordare la legislatura de Puerto Rico al organizarse.

"Por mandato del BRIGADIER GENERAL DAVIS,

"WM. E. ALMY,
"*Ayudante General en ejercicio.*"

"(*Gaceta Oficial, No. 27, Feb. 1, 1899.*)
"CUARTEL GENERAL,
"DEPARTAMENTO DE PUERTO RICO,
"SAN JUAN.

"Habiéndose interpretado equivocadamente la orden del 19 de enero de 1899 referente a la ejecución de hipotecas sobre fincas agrícolas y sus maquinarias, en el sentido de hacerla extensiva a deudas que nunca se pretendía traer bajo su jurisdicción.

"Por la presente ordeno que se ponga en conocimiento de aquellas personas encargadas de la administración de la ley, las instrucciones siguientes:

"*Primera.* Que sólo se aplicará la referida orden a los créditos garantizados por hipotecas; pues en estos casos se puede levantar

los embargos, y quedarán siempre las hipotecas como garantías. Así no sucede con créditos personales; quedaría el acreedor sin garantías si el derecho de embargar le fuere quitado, y tuviere que esperar un año para poder emprender procedimientos judiciales, durante cuyo tiempo sería fácil para el deudor vender sus bienes, y así burlarse de sus acreedores. Por lo tanto esta orden no se refiere a créditos personales, o créditos que no sean garantizados por hipotecas.

"*Segundo.* Todo proceso que se emprenda de acuerdo con la presente orden, con el fin de ejecutar una hipoteca por falta de pago de los intereses, será efectuado bajo la antigua ley que regía antes de la Ley Hipotecaria actualmente vigente. La antigua ley concede a los deudores más de 30 días para buscar el dinero con que pagar sus intereses; salvando así sus fincas.

"*Tercero.* Al embargarse una finca agrícola, y sus productos, la finca no pasará a manos del acreedor, pero se constituirá como depositario el dueño de la misma, y estará obligado a dedicar el producto de la venta de las cosechas a la liquidación de los intereses vencidos, o de la deuda principal.

"*Cuarto.* No se ejecutará ninguna hipoteca bajo el convenio de esta Orden; por no haberse pagado los intereses, cuando por razón de previo embargo el dueño de la finca esté deshabilitado para la venta de sus cosechas, y así no haya podido hacerse de dinero para atender al pago de los referidos intereses.

"*Quinto.* En ningún caso puede ejecutarse una hipoteca y vender la finca sin previa revaluación de la finca por peritos. El acreedor nombrará un perito, el deudor otro, y el tercero será nombrado por el juez.

"San Juan, P. R., *enero 31, '99.*

"Guy V. Henry,

"*Mayor General Voluntarios,*

"*Comandante.*"

Al ser interpretadas conjuntamente la primera y la última de las referidas órdenes se ha insistido mucho en el hecho de que solamente afectan al remedio y que no privan al acreedor hipotecario de ningún derecho adquirido; que la suspensión del procedimiento sumario de la Ley Hipotecaria hizo desaparecer el único obstáculo que había para la ejecución ordinaria de acuerdo con la antigua Ley de Enjuiciamiento Civil y que para sostener la validez de la Orden General No. 18 tenía que ser interpretada en relación con la Gaceta Oficial No. 27,

*supra,* en el sentido de que meramente modifica sin perjudicar formalmente el procedimiento para hacer cumplir la obliga- ·ción hipotecaria.

Que no era el propósito del General Henry el privar al ·acreedor hipotecario de ningún derecho sustancial puede in- ·ferirse de la forma en que se expresa al decir que "en caso de tales créditos se pueden levantar los embargos y quedarán .siempre las hipotecas como garantías." Que su intención fué el permitir la ejecución en cualquiera forma de hipotecas .sobre las cuales se habían pagado los intereses, o que no deven- gaban intereses, es cosa que de ningún modo aparece tan clara. Los créditos personales quedan excluídos del efecto de la prohibición porque "quedaría el acreedor sin garan- tías si el derecho de embargar le fuera quitado y *tuviere que esperar un año para poder emprender procedimientos judiciales* durante cuyo tiempo sería fácil para el deudor vender sus bienes y así burlarse de sus acreedores." Es la ejecución de hipotecas por falta de pago de intereses solamente lo que expresamente está autorizado por la antigua ley y aun en cuanto a éstos, se dice que si durante el curso de los procedi- .mientos puede el deudor hipotecario "*buscar el dinero de los intereses,*" la acción podría ser suspendida. Además, "*no se ejecutará ninguna hipoteca* bajo el convenio de esta orden por no haberse pagado ·los intereses, cuando por razón de previo embargo el dueño de la finca esté desabilitado para la venta de sus cosechas, y así no haya podido hacerse de dinero *para atender al pago de los referidos intereses.*" También la Orden General No. 18 se basa no tanto en el carácter suma- rio del procedimiento de la Ley Hipotecaria como en el hecho de que los "agricultores *no pueden pagar sus deudas* aun cuan- ·do poseen fincas de mucho valor y que muchos hombres de negocios al proceder a la liquidación de éstos en la Isla *gestio- nen judicialmente* la venta de fincas agrícolas hipotecadas con .gran perjuicio de sus dueños."

Decir, por tanto, que la Orden General No. 18 tuvo por objeto la ejecución de hipotecas comprendidas dentro de sus

disposiciones bajo el antiguo Código de Enjuiciamiento Civil sería intercalar en ella un precepto que según parecen indicar todas las circunstancias jamás tuvo en su mente el Gobierno Militar.

Pero como quiera que sea la contestación categórica al argumento del demandante y apelado aparece de la naturaleza peculiar y objeto principal de la actual Ley Hipotecaria en el caso de Barnitz v. Beverly, 163 U. S. 118, que como el caso de Ochoa es obligatorio para este tribunal independientemente de nuestra opinión y en otros casos en igual sentido citados en el tomo 6 de la obra Ruling Case Law, páginas 355, 356, secciones 352 y 360, en apoyo de la siguiente teoría:

"Es un principio fundamental de ley constitucional en relación con la obligación de los contratos que las leyes vigentes a la fecha en que se hace un contrato y el derecho a un remedio son y forman parte del mismo como si expresamente se hiciera referencia a ellas o estuvieran incorporadas en sus términos, y que a la vez constituyen parte de su obligación. El remedio que está protegido por la cláusula relativa al contrato de la Constitución, es algo más que el privilegio de hacer que sea resuelta una reclamación. La mera investigación judicial respecto a los derechos de las partes no es bastante. Tiene que existir la facultad de poder hacer cumplir lo que resulte de dicha investigación antes de que pueda decirse que es un remedio que la constitución considera como parte de un contrato. Nada es más esencial a la obligación de un contrato que los medios para hacerlo cumplir. Las ideas respecto a la validez y el remedio son por consiguiente inseparables y ambas constituyen parte de la obligación garantizada por la Constitución contra todo menoscabo."

*      *      *      *      *      *      *

"La regla general es que la ley vigente al constituirse una hipoteca con todas las limitaciones y condiciones impuestas por las mismas es la ley que determina la fuerza y efecto de una hipoteca, y de ahí que los cambios en las leyes que imponen condiciones y restricciones al acreedor hipotecario al hacer valer sus derechos y que afectan a su esencia son nulas por menoscabar la obligación y no pueden prevalecer. De acuerdo con esta regla la ley no permitirá que se hagan cambios por el estatuto, que en lo que respecta a hipotecas anteriores, extienden o de otro modo modifican el término de redención, aun cuando todavía no haya tenido lugar una ventaja; o que

dispone que se dicten órdenes sobre un término mayor para el crédito del que se permitía a la fecha en que se constituyó la hipoteca; o que alteran los derechos de un acreedor hipotecario para vender en ejecución sujeto solamente a la redención que se prescribe para el caso por la ley en vigor al constituirse la hipoteca. De acuerdo con la misma regla un estatuto que autoriza la redención de una propiedad vendida en procedimientos de ejecución de hipoteca, en que no existía ningún derecho a la redención, no puede ser constitucionalmente aplicada a una venta por virtud de una hipoteca otorgada antes de su aprobación.''

Al ser sometida la actual Ley Hipotecaria a las Cortes Españolas en el año 1893, para obtener la sanción legislativa, el Ministro de Ultramar por virtud de la autoridad del Rey, con la aprobación del Consejo de Ministros y haciendo referencia a la ley anterior sobre la misma materia que entonces regía en Puerto Rico desde mayo de 1880, dijo lo siguiente:

''Pero donde la voz de la experiencia se ha dejado oir con mayor fuerza contra la ley, demandando remedio pronto, es en lo referente al procedimiento para hacer efectivos los créditos hipotecarios. Su complicación abrumadora, la inseguridad del éxito y su costo incalculable retraen el capital o sugieren condiciones usurarias; la venta a retro viene sustituyendo al préstamo para suprimir todo procedimiento con daño del terrateniente; se estipulan intereses que triplican el capital prestado, y tal vez empleando otras fórmulas, se sujeta con responsabilidades penales al deudor, convirtiendo la santidad de las leyes escritas para castigar delitos en vil instrumento de la condicia contra el infortunio. Emplea estas artes la desconfianza, porque el procedimiento legal no satisface las exigencias razonables de la contratación, y a cortar la raíz de estos males, proporcionar a la tierra el capital que necesita, y dar al prestamista seguridades de pronto y fácil cobro, se consagra la reforma de mayor transcendencia que propone el Gobierno, suprimiendo trámites que, sin garantía positiva de los derechos, ahoga los más sagrados. La previa tasación, la fijeza en la competencia judicial para las diligencias precisas, la supresión de todo pleito, un solo requerimiento y la subasta inmediata, son las bases de la nueva legislación; suprímense juicios, excusiones, exhortos, mandamientos de embargo de lo que está ya hipotecado, incidentes, subastas simultáneas, y tantas otras barreras atra-

vesadas en la senda del crédito territorial con noble ánimo, en las que sólo tropieza realmente la buena fe.''

Véase también el caso de *Giménez* v. *Brenes,* 10 D. P. R. 128.

Atendidas estas circunstancias y sin hacer referencia a los méritos intrínsecos del criterio sustentado por el Ministro Colonial de España, quien por lo menos reseña correctamente la verdadera teoría de la Ley Hipotecaria como fué aprobada en el año 1893, nos vemos obligados a resolver que la Orden General No. 18, fué promulgada en exceso de la facultad legislativa conferida al gobierno militar de acuerdo con las instrucciones del Presidente, y por tanto que es nula y sin ningún valor en lo que respecta a las hipotecas existentes anteriormente, porque de admitirse que está en vigor dicha orden menoscaba la obligación de dichos contratos y privaba al acreedor hipotecario en este caso y a todos los demás que se encontraran en iguales condiciones de sus derechos personales y de propiedad ya adquiridos si a la verdad no les privaba de su propiedad sin el debido procedimiento de ley.

La sentencia apelada debe ser revocada debiendo este tribunal en su lugar ordenar y decretar que sea desestimada la demanda y que los demandantes nada recobren por razón de su demanda.

> *Revocada la sentencia apelada y dictada otra declarando sin lugar la demanda, sin especial condenación de costas.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf, del Toro y Aldrey.